WILBUR C. FISK *vs.* EDWARD A. BOWER & others.

Essex. March 8, 1917. — May 30, 1917.

Present: RUGG, C. J., BRALEY, DE COURCY, PIERCE, & CARROLL, JJ.

*Subrogation. Equity Jurisdiction,* Subrogation. *Equity Pleading and Practice,* Master's report.

In a suit in equity against the maker of a note and the persons bound by agreements between the maker and a corporation and others interested in the corporation, which were made to provide the maker with security for the repayment of a sum of money stated therein to have been lent by

him to the corporation, the plaintiff, who by reason of his indorsement had been compelled to pay the note, alleging that by means of such indorsement the maker had been able to procure the money which he lent to the corporation and as security for the repayment of which by the corporation the agreements were made, sought to be subrogated to the rights of the maker under the agreements; but a master to whom the suit was referred, after a detailed statement of the transactions but without a report of the evidence, found that the plaintiff did not lend the money to the corporation and that the maker never borrowed any money, the repayment of which was secured by the agreements, and, upon a reservation of the case, this court *held* that the master's findings were not inconsistent with each other and that his conclusions were not clearly wrong, and ordered the bill dismissed.

BILL IN EQUITY, filed in the Supreme Judicial Court on April 11, 1914, against Edward A. Bower, Frank M. Garland, Benjamin T. Way, Walter Coulson, Edgar Gilbert and the Lyster Chemical Company, a corporation, wherein the plaintiff, having paid a note of Garland indorsed by Way, by the plaintiff and by Gilbert, sought to be subrogated to the rights of Garland in an agreement, described in the opinion, between him and the Lyster Chemical Company alleged to have been made as security for the repayment to Garland of $10,000, which the plaintiff alleged Garland procured by means of the plaintiff's indorsement upon the note, and the agreement, also described in the opinion, between Garland and Bower, guaranteed by Way, Coulson and Gilbert, relating to the carrying out of the first agreement.

The suit was referred to a master. Material facts found by him are set forth in the opinion. The plaintiff filed exceptions to the report, based upon the following objections, which he stated were based upon the ground that the findings or rulings therein described were either rulings of law which the master had no authority to make and which were erroneous, or conclusions of fact manifestly inconsistent with the other findings of the master:

"4. Because the master found or ruled that Garland never borrowed any money upon the bill of sale and the Bower contract.

"5. Because the master found or ruled that 'so far as Fisk was concerned the transaction was not a loan by him of $10,000 to the Lyster Company, either through the medium of Garland or otherwise.'

"6. Because the master found that there was no agreement expressed or implied that any or all of the defendants should pay

the $4413.80 received by Garland from the proceeds of the $10,000 note and no agreement expressed or implied that they would use the products of the Lyster Chemical Company for that purpose.

"7. Because the master found and ruled that 'Garland has no rights under the bill of sale except in the event that he raised money on the bill of sale,' and that 'he never did raise any money on the bill of sale.'"

The suit was reserved by *Pierce,* J., upon the pleadings, the master's report and the plaintiff's exceptions to the master's report for determination by the full court.

*R. G. Dodge,* for the plaintiff.

*B. B. Jones,* for the defendants.

CARROLL, J. On July 22, 1911, the defendant Garland made a note for $10,000 payable ninety days after date to the National Bank of Methuen. It was indorsed by the defendant Way, the plaintiff, and the defendant Gilbert, in the order named. The plaintiff paid the note to the extent of $9,691.11 and he seeks to enforce a certain agreement given to Garland, accompanying a bill of sale from the Lyster Chemical Company, hereafter called the Lyster Company, as security for a loan to be negotiated by Garland for the benefit of the Lyster Company and, as contended by the plaintiff, actually negotiated by means of the plaintiff's indorsement.

The master found that Garland never borrowed any money upon the bill of sale and accompanying agreement and the transaction was not a loan by Fisk of $10,000 to the Lyster Company. A decree was entered taking the bill for confessed against Garland.

The Lyster Company was in need of working capital and in order that Garland might secure a loan for $10,000 the document spoken of as a bill of sale was made to him and his assigns. It included the entire merchandise inventory of the Lyster Company and recited that it was given as collateral security for a loan of $10,000 from Garland to the company, and if sufficient products were not sold in ninety days to repay the loan, the company was to forfeit all right to redeem. At the same time an agreement in writing was made between Garland and Bower, by which the former appointed Bower his agent to hold and dispose of the products mentioned in the bill of sale, and Bower agreed to keep them separate from the other merchandise of the Lyster Company, to keep

an accurate account of the goods sold, and to deposit the proceeds in the National Bank of Methuen in Garland's name. The agreement contained a stipulation that, although the "bill of sale is absolute in form, . . . it is to be held as collateral security for a loan made by" Garland to the Lyster Company for the sum of $10,000 and, upon repayment of the loan, the bill of sale was to be null and void. Way, Coulson and Gilbert agreed in writing that Bower would carry out the agreement and that they would "make good any default on his part." Garland took the documents to New York, where the plaintiff had a place of business, and showed them to him. He, Garland, stated that they had been given to secure him for money he was to raise for the Lyster Company. At the suggestion of Fisk an attempt was made to borrow the money at the National Bank of Methuen on the strength of the bill of sale, but the attempt failed. On July 22, 1911, the note, unsigned, and the above mentioned documents, were in Garland's possession. On July 27, Garland, Gilbert, Way and Fisk had a meeting and Fisk then indorsed the note. He knew that Garland was not financially responsible and believed that either Way or Gilbert would find "it difficult to pay the note if called upon," he did not rely on any assistance from them, and believed that the money to pay the note when due, October 20, 1911, would be supplied in part at least from the sale of the merchandise mentioned in the bill of sale. At this conference it was agreed that the proceeds of the note should be divided by paying the Lyster Company $4,500 and by paying to Garland $4,500 "for his company," that is to say, the Chemical Manufacturing Company of New York, hereafter called the Chemical Company, and that he should repay Fisk $1,000 of the loan he had previously made to the Lyster Company. Accordingly, when the note was discounted, $4,429.50 was credited to the Lyster Company's account and a cashier's check for $5,413.80 was given to Garland and from which he paid Fisk $1,000, the amount of his loan. There was no evidence of any other loan for $10,000.

At a meeting of the directors of the Lyster Company on July 31, 1911, it was voted that the act of the treasurer in paying Fisk $1,000 be ratified, and also his act in paying Garland $4,500 "on account of the advancement of $10,000 on said bill of sale," and it further was voted "that a bill of sale, signed in behalf of the

company by the president and treasurer, to Frank M. Garland, of New York, of certain assets of the Company on account of the sum of ten thousand dollars ($10,000) to be advanced by said Frank M. Garland to the company, be ratified and confirmed."

When the note fell due, $308.89 was on deposit in the National Bank of Methuen to the credit of Garland, deposited by Bower under the agreement. Garland drew his check to Fisk for this amount, and Fisk made his check for $9,691.11. Both checks were used in payment of the note the day after its maturity.

Bower deposited the proceeds from the sale of the products mentioned in the bill of sale in Garland's name from August 24, 1911, to February 26, 1912, and the other defendants knew this. In October, 1911, "Bower, Way, Coulson and Gilbert knew and intended that said deposits up to the amount of $10,000 were to be applied toward the payment of the said note." Bower rendered statements to Garland stamped, "Sold under Garland Bill of Sale," and these statements were shown by Garland to Fisk. Bower also rendered to Garland a weekly or monthly financial statement, the last one for the month ending February 29, 1912. Merchandise described in the bill of sale was finally sold to an amount sufficient to pay the entire loan. The master found that, if the deposits made by Bower to Garland's credit amounted to $10,000 when the note matured, "it seems probable that Garland would have written his check on that bank for $10,000. . . . It seems probable that, if the note had been paid in this way, such action would have been considered right and proper."

These facts, standing by themselves and unexplained, would be controlling. They would justify if not require a finding that the plaintiff lent the money to the Lyster Company, that the agreements were security for the loan, and that he is entitled to their benefit. This is so, although he did not directly lend the money to the Lyster Company but did so by indorsing the note; — and although the Lyster Company was not a party to the note but received its proceeds and distributed them according to the agreement of the parties. No assignment was necessary to give this right of subrogation to the plaintiff, nor was it necessary that he should know of the existence of the security when he incurred the obligation. *Craythorne* v. *Swinburne*, 14 Ves. 160, 163, 165. *Lane* v. *Stacy*, 8 Allen, 41. *Jennings* v. *Wall*, 217 Mass.

278, 285. *Duncan, Fox, & Co.* v. *North & South Wales Bank,* 6 App. Cas. 1.

On the other hand, on evidence not reported, the master has found that Fisk did not lend the $10,000 or any part of it to the Lyster Company, but expected to be paid out of the funds of the Consolidated Chemical Company of America, a consolidation of the Lyster Company and the Chemical Company, which consolidation Fisk was interested in and was expected to aid financially; that the agreements were independent of and had no relation to this particular loan and were not in fact security for it. These findings cannot be set aside unless plainly wrong.

The master stated, in response to the request of the plaintiff to report the evidence upon which he found that "Fisk said he would pay the note out of the Consolidated Company's funds . . . My finding is based also upon other evidence . . . not only upon what other witnesses directly stated : . . . including both oral and written evidence, and the appearance, bearing and conduct of the witnesses." See *Rubenstein* v. *Lottow,* 220 Mass. 156, 165.

The master found that the plaintiff was a member of the firm of Harvey Fisk and Sons, bankers and brokers, that Garland was the president and treasurer of the Chemical Company, a corporation whose only asset was a formula claimed to be a remedy for cancer. Garland and the Chemical Company owed Fisk $19,790. Fisk was interested in the consolidation of the two companies. He believed that large profits would thereby result to him from his right to subscribe for shares through his control of shares in the Chemical Company, and when effected, the Consolidated Company would have funds to meet the note; that neither the $5,413.80 nor that sum less $1,000 which Garland paid to Fisk, was a partial payment of the $10,000 to be advanced. All the parties believed that this consolidation would be effected, and that before the maturity of the note the Consolidated Company would have funds with which to pay it, and in this sense, Fisk to a certain extent relied on the products inventoried in the bill of sale. Before the note was indorsed Fisk said, "There isn't any trouble about getting all the money we want, this stock is so good I don't feel any uneasiness and I don't want you fellows to. I will take care of the needs of the company until this money is raised." When the matter of securing funds by means of the bill of sale

was first suggested, Gilbert objected that this would mean that the Lyster Company's stockholders were raising the money, whereas it was understood that the money to finance the consolidation was to come from New York, to which Fisk replied that the raising of the money would not affect the main proposition, that it was merely temporary money to meet the needs of the two companies until the whole amount was provided. When the note was indorsed the plaintiff said he would like to have Way and Gilbert also indorse and in answer to Way's statement that he did not care to become liable for money raised for the Consolidated Company, Fisk said he would pay the money out of the Consolidated Company's funds and he desired Way and Gilbert to indorse, not for the purpose of making them liable, but to show the Lawrence people that all parties were working together on the proposition. Way and Gilbert then signed, relying on Fisk's promise that they would not be called upon to pay the note, that he would pay the note out of the proceeds of the stock of the Consolidated Company. At this time nothing was said about holding the bill of sale and Bower agreement as collateral to the note.

When the note was paid, the plaintiff's attorney notified Way and Gilbert that the plaintiff would hold them as indorsers. They called upon the plaintiff and asked him what it meant. He replied that it was a formal matter and if he had been at home "the notice would not have been sent, and that he did not intend to assert any liability against Way or Gilbert in regard to the note." On December 14, 1911, Harvey Fisk and Sons wrote that they did not care to undertake to finance the proposition.

When the votes of the directors of the Lyster Company were passed, Bower, Way, Coulson and Gilbert believed that the money from the sale of the capital stock of the Consolidated Company would be more than sufficient to pay the note. They were induced to entertain this belief because of representations made by the plaintiff. When the votes were passed, they did not know the documents had been shown to Fisk or that he intended to resort to them for payment, and, believing the consolidation to be certain, "it was desirable to pass these votes so that entries might be made tending to close the books of the Lyster Company."

With reference to the entries and deposits made by Bower, the defendants regarded the Lyster Company and the Chemical

Company as constituent parts of the Consolidated Company and the $1,000 loan from the plaintiff was entered in the cash book and journal of the Lyster Company, "To the Consolidated Chemical Company of America $1,000 deposited in the Bank." While Bower made certain entries, he was under no legal obligation to make them or act as agent for Garland, and Garland never raised any money on the bill of sale.

The finding that, if products to the amount of $10,000 were sold and Garland drew his check, such action would be considered right and proper, is to be taken in connection with the other findings that the two companies were parts of one company and that the consolidation was certain to be accomplished; in fact, the Consolidated Company had already received a charter under the laws of Maine.

In March, 1912, Garland assigned to Fisk his interest in the debt, in the bill of sale and Bower agreement.

Although we have not recited all the facts, we have set them out at considerable length, and while there are many circumstances tending strongly to support the contention of the plaintiff, we cannot say, in view of all the findings of the master, that he plainly was wrong in his conclusions in deciding that Fisk made no loan to the Lyster Company and that the bill of sale and the collateral agreement were not collateral security for the loan and therefore that the plaintiff is not entitled to avail himself of its benefit.

The exceptions to the master's report are overruled and a decree is to be entered dismissing the plaintiff's bill with costs.

*So ordered.*